3-1-0-0-1-4-9 Treson-Helfers-Beitz appellant Scott Gannison v. Proctor Hospital et al. at the Lee-Craig-Unrack Mr. Gannison, are you ready to proceed? May it please the court. My name is Scott Gannison. I'm here essentially asking the court to provide a reversal of the underlying decision by the circuit court. We're here about a situation where Treson-Helfers-Beitz, now Treson-Helfers, well, she was involved in a situation where she had some shoulder problems. Unbeknownst to her, her problems started long before that, though. What happened was the hospital, Proctor Health Care, had essentially set up a situation where there's multiple entities involved, but they would hire individuals such as Dr. Diehlman, a plaintiff or rather a defendant in this case, to go ahead and hire him. Then his services would be turned over to Proctor Hospital through a transfer of the contract. What happened was Dr. Diehlman was hired in 1999. At that time, he was hired by the Professional Medical Association, or PMA. The Professional Medical Association was essentially, it was a company that was, its only purpose, its sole purpose was to hire medical doctors for the facility, Proctor Hospital. That entity really no longer exists or is really a useful entity at this point. What happens is that eventually Dr. Diehlman, he was brought on, with time he was brought on by the Professional Medical Associates. The only thing they did was they went ahead and checked his basic credentials. Does he have a medical license? They went ahead and checked to see if he had active medical insurance. That's essentially it. That was the nature of the background check. Then we go on. This gentleman then has his contract transferred to Proctor Hospital. At the time of the transfer to Proctor Hospital, what happens is that they did no additional check. Zero. They didn't check his background. They didn't go ahead and check into contacting other employees or employers rather. They did nothing. They went ahead at one later time. They were going to try and stand behind some later services that were performed by them as well as by a company or rather the Peoria Medical Society. What happens is in 2001 they decided they wanted to become certified as a facility through the Joint Commission. So credentialing is required apparently by the Joint Commission. In order to do credentialing, they used the Peoria Medical Society. Peoria Medical Society appears to have a very lax or at least at that time they had a very lax background check. What they did was they went ahead and checked on people. They would go ahead and check their credentials to see if they were a doctor, see if they had licensing, see if they had a criminal background, and they would also send out letters to various facilities where the doctor supposedly worked. We have it upon at least the expert that we have in this case went ahead and said yes. That's the problem with them going ahead and sending these requests to the various physicians or various prior employers was simple. They didn't have a follow-up system. And what happened was that unfortunately if they didn't get a follow-up, let's say from a hospital from Wisconsin such as the case here from St. Clair Hospital, then what happens is that that hospital essentially is thus the deeds that occurred there are left unheard and left undiscovered. What happens in this instance, Dr. Diegelman unfortunately as we later find out, well, he had a very bad background, something that should have been discovered through just some simple checking. We found out as plaintiffs in this case, we found out later in the process after eventually a suit was filed by using, well, an attempt to use a subpoena. The subpoena itself failed. Then we were able to obtain by agreement to the parties a release from Dr. Diegelman which allowed us to get his records from the hospital. Certainly that is something that any one of the defense entities in this case could have easily done also. In any event, what happens is that Bellcrest did the initial credentialing. They're the ones who did that credentialing in 2001 for the hospital. Essentially, if we think about it, 99 was the time of the original hiring where literally nothing was done except checking his, well, his CV. What happens is that then Bellcrest in 2001 for the credentialing process through the hospital then hires the Peoria Medical Society. Bellcrest just looks at what the medical society has done, rubber stamps it, and that's it. They don't do any independent check. They don't call the hospitals. Nobody did anything. The Proctor Hospital did nothing. What happens is that there is something in our way a little bit here. The Medical Studies Act has been used as a shield by the hospital to go and prevent us from looking at the various records of the various entities to determine what, if anybody, said about Dr. Diegelman. We've been prevented from getting to those things. They only get to say they found nothing that would be bad, but we didn't get to see the records because of the Medical Studies Act, at least as determined by the judge in the case. Well, what happens is the Joint Commission standard requires prior employers to be contacted, but the interesting part is we only have the word of the Peoria Medical Society and the defense that they did. We have no written proof. In fact, the only written proof that has been distributed or seen today is that from the Council for the St. Clair Hospital. The Council for the St. Clair Hospital is a location where, again, Dr. Diegelman worked in the past, and that council had indicated that we never received anything from the Peoria Medical Society. It's a coin letter. I'm sorry? A coin letter. Yes, sir. But that's not an affidavit. Can that be used in a summary judgment? Correct, and it's not in an affidavit form, although one could certainly argue that because she's an officer of the Wisconsin court that it should serve in the role of an affidavit. But it doesn't fulfill the 191 requirements about affidavits or information for summary judgments. I do absolutely agree with that. In fact, what happens, Judge, it should, though, be considered by the fact that it was, though, employed by the expert in this case that was hired by us. That expert went ahead and testified the fact that she did consider that. She considered the statements of Ms. Coyne. And so it comes in in that fashion. At least the statements of the facility come in, if not the actual document itself. Those statements saying that we never. Did they make a Wilson v. Clark type of showing then that it was information that she would normally rely on? Correct. So it would come in in that fashion. Not as substantive evidence. Not at this stage. But what would happen is if we actually went through a trial, we would have the opportunity then, of course, to bring counsel down to testify or somebody else from that facility. But right now we have a summary judgment. Correct. And it appeared through the Wilson case, we could go ahead and bring it in in that fashion. And it should have been enough to, at least in my mind, my humble thoughts, that what happens is it should be enough to come in, at least the words of the document come in, as the expert did consider in this normal type of document you would consider. You know, as to the, you're talking about your expert Nunley? Yes. Does Nunley really provide expert opinion with regard to the industry standard or what's required in these areas? Or just that Nunley would have done things differently? Good point. Because that's different. There's a big difference between that and negligence cases. I agree. What happens is I believe Nunley does go and provide, well, she expresses what the standard was for the community and what she feels went wrong. She goes ahead and also, I would think, disputes, or at least in her statements disputes, that it is the standard at all. What happens is the defendants or the proctor defendants try and create the impression that what they have done is the standard because they do it. That doesn't make it a standard. That goes in and makes it just a practice that they employ. But the reason I'm asking the question is she doesn't establish, I mean, Nunley doesn't establish a standard or that what they did was unreasonable. Nunley establishes that Nunley does something different. Correct. Nunley goes ahead and says this is the way the hospital and Illinois Valley Community Hospital did it. This is the way she did it. We were offered by the Peoria Medical Society to employ their services, but they declined at the Illinois Valley Community Hospital. She was one of the people considered in that process of denial and felt that the process was inadequate, it was inappropriate, and certainly I feel she's indicating that that was not the standard for the community, but rather they were doing it better and they represent the standard at Illinois Valley Community Hospital for the Illinois Valley as compared to the way in which the Peoria Hospital did it. That doesn't, the fact that if she doesn't, well, if she doesn't specifically address the way she or they did it, it still sets a standard that somebody gets to consider as to what is the appropriate way to do it, we believe. In any event, there are multiple causes of action. Well, just because they have a difference of opinion on what's acceptable or they have an alternative course of conduct, that doesn't make it a violation of standard of care, does it, or a violation of what's reasonable? Well, I think what it comes down to is the circumstances that a jury gets to consider and it's a question of fact as to what's reasonable in that circumstance. We have a potential standard of care. For example, if the government establishes a standard of care for something or establishes a standard, just because they establish a standard as evidence of what it is doesn't mean it's the full thing. Well, how is evidence from one person that they would do something differently and evidence like the government standard you're talking about? Well, I believe here, for example, we look at just another hospital that would be within the Illinois Valley that goes ahead and does it in this fashion. That's the standard they employ, and she felt that that is the appropriate standard as compared to the one at the lower and more reduced standard, if we want to call it that, that was employed at the Peoria facilities. But that's not the only part of the case we have. We have multiple issues here. Very simply, that just goes to one portion. We have multiple counts. But what it comes down to is if we start from the situation where my client walks in the door in December 2004, she sees Dr. Diegelman provide shoulder and arm pain. She goes ahead, he palpates in a later examination in 2005, February 15th, palpates around the arm, and then he decides to go ahead and palpate around her breast. In March of 2000, I'm sorry, right after that evaluation by the doctor, she feels essentially that she has been inappropriately touched. She feels essentially that she's been raped, and she has just a very sickly feeling over the whole event. She tries to communicate that to her husband, who is a dental professional. He goes ahead and says, no, honey, you've got to be wrong. She takes that a different way and doesn't like the fact that she's not being believed. Frankly, she's a person who went ahead. She was a person who was a stripper in the past. She thought she had left that lifestyle behind her, but she now felt that there was coming back to haunt her, like somebody could go and touch her and abuse her at their will. So the doctor's not dismissing this case? No, sir. Not at that time. That's not part of the issue here. But what happens is very simply, so he goes ahead, or I'm sorry, she goes ahead and brings a nanny cam to the next visit. The nanny cam goes ahead and tells us much of the story. She's a patient that she should be treated with respect. Instead, she's treated with, well, in an inappropriate fashion, where he goes ahead and does what he does. He goes ahead and touches her inappropriately, goes ahead and kisses the body parts they shouldn't be near. He fondles her inappropriately, hugs her when it shouldn't be occurring. And what happens is the hospital, despite all this occurring, has never taken the appropriate steps to go in and prevent this type of activity. Dr. Degelman, who's acting as a doctor who typically might, at least on his face, in checking some of these issues that she has with pain and discomfort in her shoulder and the arm, but then he goes far beyond what one might expect, at least from her perspective, and he goes ahead and touches her inappropriately. That's not providing medical care. Yeah, he's passed the medical care. He did provide some as part of each visit. He gave her medication. He prescribed an MRI. He provided some care, but at the other time he provided these other activities, which were wholly inappropriate. And now what happens is a lot of that— As to the credentialing claim that you have, the negligent credentialing, that's on the assumption that there's an underlying medical malpractice claim. Isn't that right? That kind of claim is grounded on an underlying medical malpractice claim. Isn't that right? The credentialing claim. Well, credentialing, we take it in a different way. There are certainly the cases that are there talking about a medical malpractice claim. We have not pursued one. We believe that the simple fact of credentialing is really something that allows this gentleman, his passage into the room with the patient. If he didn't get the credentialing in 2001, as provided by Bellcrest in the hospital, what happens is that he would have never been let into that room. The easiest way to have prevented his access would have been an appropriate investigation, which would have discovered that he had improperly followed people in the past and had inappropriate contact with these people in the past up in St. Clair. But isn't it correct that credentialing claims have been grounded on an underlying medical malpractice claim and you don't have an underlying medical malpractice claim? I believe you're correct. So you're attempting to strike new ground in this area. You're trying to expand the tort in this area on credentialing beyond medical malpractice claims. I believe we are. From that perspective, I don't think it's much of a distance that we're asking to go, frankly, because one just goes ahead and addresses the issue of medical malpractice was a standard violated in that respect, but what happens is we're looking at that just essentially as the key to get in the door. Without the credential, the door is not open. Counsel, that's two minutes. The other issues that we see before us are quite simple. What happens is that the doctor was negligently, not only negligently hired because they didn't go ahead and check up on any of these things in the beginning, and, again, there's no true evidence that the doctor's background was even looked into. What happened was, again, in 2001 there's a negligent retention that from our perspective appears to have occurred. We go on. There's a negligent supervision. The doctor was not looked after. His efforts were not checked. What happened was he was never accompanied by individuals or doctors into the exam room, and, in fact, this doctor had complete total authority as to whether or not he was going to be accompanied by a nurse, even if there was only a female in the room that he was reviewing. They had no policy at the hospital regarding sexual harassment of patients, and that these combined could have- Can I ask you about the employment issue, about the responding to superior claim that you have?  The scope of employment, though, in this situation did not include sexual misconduct, did it? Well, actually, this has been considered by the St. Palfire Marine v. Downs case, and these types of cases have been included in that type of thing. And, in fact, yes, the client walked in there, and it's reasonable and appropriate that she expect to get an examination. That's what she went in the door for. Did the doctor take it one step too far or two steps too far? He sure did. But what happens is that cases cited by the defendant seem to say that, as a matter of law, there's never liability for sexual misconduct, and that's just, frankly, untrue. Look at the St. Palfire Marine case. And what it comes down to is each visit was not only something that contained the sexual misconduct, but it also contained actual medical care, and there's a question of borderline. In either respect, clearly the hospital can be held liable for the inappropriate acts of its employee. We'd ask the court to reverse the decision of the judge in this case. Thank you. Mr. Reynolds? Thank you, Your Honor, Dr. Newman, counsel. Sometimes life deals you small favors, and in this case the favor that I've received is that I don't have to defend Dr. Dagelman. Dr. Dagelman's conduct was abhorrent, inexcusable. He was fired. And I think I can speak on behalf of my clients when I say good riddance. The claims that we have against the proctored defendants, we have negligent hiring, negligent retention, negligent supervision, negligent credentialing. Again, the credentialing does suffer from a certain difference because it's to date only been applied in medical malpractice actions. But they all are bound by a single thread. Did the proctored defendants know or should they have known that Dr. Dagelman was unfit for the job so as to create a danger of harm to third persons? Now, no one suggests that any of the proctored defendants had actual knowledge of any problems with Dr. Dagelman. So the whole issue here is should they have known. Now, what they did is in two separate occasions they had the Peoria Medical Society conduct an exhaustive investigation of his background. That investigation was done under standards established by the Joint Commission, which is considered the gold standard nationwide. This is employed by over 17,000 hospitals across the country. The reports came back clean. There were no indications of any disciplinary actions ever taken against Dr. Dagelman. Now, if Peoria Medical Society made a mistake, can that mistake be imputed to the proctored defendants? Only on one condition, only one way can that connection be made, and that's if the proctored defendants unreasonably relied on Proctor Medical Society to perform this evaluation, this background check. Now, we are very fortunate to live in the Peoria area in that we have one of the single most sophisticated medical communities in the entire Midwest area outside of Chicago. Every single hospital credentials its physicians through the Peoria Medical Society, and those Peoria Medical Society, we have undisputed testimony that they performed those investigations under the principles, the standards established by the Joint Commission. Now, try to imagine if we had done what plaintiffs suggest and conducted our own investigation. What if we had said, forget about the Peoria Medical Society? We can do better. Can you imagine the posture in this case? You mean you turned your back on the standard, which is the Peoria Medical Society? Every hospital, every physician in the Peoria area is credentialed through that process, and you turned your back and you did your own investigation? Quite frankly, we would be in a really uncomfortable situation. We had every right to rely on the Peoria Medical Society's background check. The trial court looked at this, and the court, in its order, it said, had the defendants conducted more than a cursory review, they would have learned, he's describing the plaintiff's argument, had the defendants conducted more than a cursory review, they would have learned of the existence of prior complaints. And he answered that question with a single word, how? How do you do that? We would have sent the same letters that the Peoria Medical Society sent. We would have asked them, has this doctor ever been subjected to disciplinary action, and is there any reason to think that we would have received a different answer? Now, they do have the affidavit of Dawn Nunley, and she says, well, she's never worked with Peoria Medical Society, but apparently she had an opportunity to engage them in business, and she said, I'm not going to do it because I believe that their background checks are not very good, that they don't look into prior disciplinary actions, which on its face is a little bit hard to believe, but that's not the issue here. We're not here to attack her, I guess, the believability, the credibility of her opinion, but it is just that, it's opinion. Now, what do we have to respond to that? What we have is sworn testimony that in this case the hospitals were asked whether Dr. Degelman had complied with all rules and regulations at St. Clair Hospital. In this case, Peoria Medical Society inquired as to whether any disciplinary action had been taken. They did this on two separate occasions, and on two separate occasions, St. Clair Hospital responded, no, there's been no disciplinary action against them. Did the proctor defendants have a right to rely on those answers? Now, those answers were given to Peoria Medical Society. All that information was passed on to the credentialing coordinator at Proctor. It was reviewed, then it was moved to a medical board that again reviewed it, and then it was taken up to the medical director and reviewed. They referred to the coin letter to dispute that there was a contact at St. Clair Hospital. Isn't that right? Well, as this court pointed out, it's not a sworn affidavit. It's just a letter from someone who said that I contacted. I'm an attorney in Wisconsin, and I contacted St. Clair Hospital, and St. Clair Hospital told me that the Peoria Medical Society never asked about Dr. Degelman's background, which again, you have to wonder how that could possibly be, but let's take it as true. First question, who did Sarah Coyne talk to at St. Clair Hospital? Did she talk to somebody that actually had authority to speak on behalf of the hospital? Does she represent that hospital? There's no indication of that at all. The letter on its face is a bald-faced conclusion from an attorney in Wisconsin. That person is not an officer of this court, and it's not a sworn letter. Now, they backdoor this in by giving this letter to Dawn Nunley, and she says, well, I relied on that unsupported evidence. Well, that doesn't make it so, Your Honor. It's still conclusory and without foundation and without substance. It is completely inadmissible in court. Now, we have a problem in this case. Plaintiffs are claiming, well, you have sworn testimony from the Peoria Medical Society saying you looked into Degelman's background. We have sworn testimony from Proctor Hospital, I'm probably mispronouncing her name, but Ms. Chevarelli, who said, I reviewed that material, and St. Clair Hospital did respond, and they told us that there were no disciplinary problems. And they said, but that's the only evidence we have. Well, it's true. Under the Medical Studies Act, credentialing files are privileged. Now, that is not an interpretation. That is not our reading of the Act. That is the explicit language of the Act. Now, if every claim for negligent hiring, negligent retention, negligent credentialing says, well, we need to see that file, well, what happens to the Medical Studies Act privilege? It disappears. We have no choice but to rely on the sworn statements from the Peoria Medical Society and from Ms. Chevarelli. And again, if the Peoria Medical Society lied to us, if they didn't inquire about his background, is that our problem? Is that, can that negligence be imputed to us? The fact is, is that every single hospital in Peoria relies on the Peoria Medical Society. It is the standard. Now, one last thing. You know, I pointed out earlier, the trial court asked how. How is it that an investigation on the part of the proctor defendants would have been any different from the Peoria Medical Society? If we'd sent letters to St. Clair Hospital, what reason do we have to believe that they would have answered any differently? Well, they tell me that they filed, they submitted a subpoena. And that's, I understand that. Illinois has no subpoena power over Wisconsin. But apparently, my understanding was, they responded to the subpoena. Now, for the first time, I'm hearing that the hospital refused to honor the subpoena, which is correct, and that they obtained this information by striking a deal with Dr. Degelman, where he agreed to waive the privilege and give them the credentialing file from St. Clair Hospital. Your Honors, we can't do that. We can't strike a deal after the fact. The whole purpose of this inquiry is, what did we know prior to the sexual harassment? And sexual harassment is putting a bit of a gloss on it. I would call it more like a sexual assault. But the fact is, what did we know prior to this misconduct? And the fact is, we didn't know anything about it. And the fact is, we couldn't have found anything about it. Finally, Your Honor, you touched on the respondent superior arguments. Again, I've seen numerous courts in all different contexts find that respondent superior will not survive in claims involving sexual misconduct. And the reason for this, quite frankly, is simple. There is no way that you can find a characterized sexual misconduct as being in furtherance of the employer's interests. With that being said, Your Honor, we strongly urge the court to uphold the trial court's order and grant a summary judgment. Can you ask a different question than the questions that are asked by the Peoria Medical Society, the gold standard questions? You said that the question that they ask is, has this doctor ever been disciplined? Can you ask, has there ever been a complaint against this doctor? Oh, absolutely. Absolutely. Is that a more pertinent question? No, I don't have it with me here. But I have a list in my brief of the sum of the questions that the Peoria Medical Society and Ms. Chevarelli referred to in their sworn testimony. One of them was, has Dr. Dagelman followed all the rules and regulations of your hospital? Right there. If there had been complaints or not been complaints. The fact is, if he had been engaged in sexual harassment, that should have been a response that we would know about. Had he been disciplined, that's taking it to another level. But did he follow the rules and regulations? And St. Clair Hospital said, yes, he had. Okay, but there's nothing that's really focused on whether or not this kind of problem, that the plaintiff in this case is complaining of, is likely to arise with this doctor. I mean, has he followed all the rules and regulations is a pretty generic kind of question. Are we talking about medical rules and regulations? Are we talking about procedural rules and regulations? I mean, I don't know that if I were answering that question, I would feel that I should say, well, somebody complained of inappropriate sexual conduct. One other question that was asked was, were any complaints raised as to his ethical conduct? And I believe that that would certainly fall under sexual misconduct. Again, if an individual, the whole basis of the plaintiff's complaint here is that he was disciplined for sexual harassment. Now, we don't know the nature of that. We don't have any facts about the nature of that. But we asked, had he been disciplined? When I say we, I say the Peoria Medical Society asked that. And they said no. Had they answered truthfully, they would have said yes, he was disciplined for sexual harassment. We didn't get that information. And the fact we cannot be held liable for St. Clair Hospital's neglect in failing to inform Peoria Medical Society. We should not be held responsible for Peoria Medical Society's inability to issue subpoenas or strike deals with the doctor to have him waive privileges. Every single hospital in Peoria conducts these extensive background checks. We should not be asked to go further than that. Counsel, last two minutes. I have a question. Yes. I need to understand the relationship between Proctor, the Peoria Medical Society, I think it might be Associates, and Belchrist. Yes. The hospital hired PMA to credential. And then PMA, I think, relied on Belchrist to interview. Is that the way it worked? Yeah. You know, I've seen a corporate diagram of a number of different hospitals. And quite frankly, my brain is not big enough to understand all of it. But it comes down to this. Good. And I don't feel so bad. You don't know half of it. If you saw the full corporate diagram, you'd be stunned. Right. Well, let me ask you. The reason I ask that question is every time I've applied for a job, I have a face-to-face interview with the employer. And it seems to me the quickest way to figure out whether he has had any problems in the past is to ask him rather than send letters to previous employers. But in this case, the hospital did not conduct a face-to-face interview. It looks like Dr. Hammond and Todd Baker of Belchrist did that face-to-face. And Dr. Hammond and Dr. Belchrist are all physicians that work for Proctor and or Belchrist.  Well, that helps me a little bit. Yeah, it's all closely intertwined. I believe that he was initially hired through PMA, Peoria Medical Associates. This was turned over to Belchrist, which supplies physicians to the hospital. And yet Belchrist and PMA are both wholly-owned subsidiaries of Proctor and are staffed by Proctor employees. Okay, then help me with another question I have in my feeble brain. That is, is there a difference between credentialing and hiring? In my mind, I see credentialing as part of hiring. Yeah. Or are they one and the same? They really are not. The background check that we ran on the initial hiring just checked into his licensure, his insurance, asked for letters of references from four different hospitals as to his professional and ethical abilities. But, no, it was nowhere near the level of investigation involved in credentialing. And credentialing is really a standards establishment. Say that again. You're telling me the hiring that came first had a lesser threshold than the credentialing that came later? Yes, it did. And it's because at the time he was hired, Proctor Hospital was not certified by the Joint Commission. Soon after he was hired, I believe it was in 2001, they sought Joint Commission accreditation. That was his initial background check through PMS, Peoria Medical Society. They do that every two years. Peoria Medical Society conducts a complete and exhaustive background check every two years on every physician within their Proctor's employ, or not even employ, anyone who has staffing privileges. Thank you. Thank you. Thank you. If I may, to help clear any confusion, what happens is that the Peoria, there's more initials here than there should be, so I'll try and avoid some of the initials, but professional medical associates, they are owned specifically by Dr. Hammond. Dr. Hammond goes ahead and supplies, or does the initial hiring process. He goes ahead and is a supplier of individuals to Bellcrest, and then Bellcrest eventually goes ahead and then turns them over to Proctor Hospital. Kind of a strange multi-step thing that occurs, and we're not sure why. If it's for purposes of liability or if it's for whatever purpose it may have, but we know that the threshold of hiring back in 1999 when Dr. Diegelman was hired was extremely low. It was looking to see if he had an active license, and they would provide, he would receive, or provide, I'm sorry, So is it possible that he could have been negligently hired first but properly credentialed later? That's entirely possible. Our belief is that he was hired improperly first, and then again, through the credentialing process, which we believe was also misguided and fell short, he again was retained inappropriately. That's where we come up with one of the issues of negligent retention, and then also where he was originally hired inappropriately. The hiring process was something when a kid through a handy food store would go through. Tell me when you think the negligent retention began. Was it after the incident in question or before? I actually think it was before the process. Is that what your complaint alleged? I believe it does. It may not be as clear as it should be, but I believe that the process occurs that during his employment, they continued to keep him on, and what happened was, for example, one of the clear points that they should have gotten rid of him is when they did the credentialing process. The credentialing process was flawed. As you'll note, again, the plaintiff is the only one who produced the document that says St. Clair Hospital was never notified or requested by any of the entities, Peering Medical Society or any of the proctor entities. That's from the lawyer that's not a proper affidavit, right? But it comes in through the Wilson case. Does it come in through the Wilson case, because is it something that the expert traditionally relies on in that field? She testified, at least in her document, she testified that it was relied upon. She said she relied upon it. Do they rely upon that in their field? I cannot recall the exact terminology. See, that's a requirement in Wilson v. Clark. I would agree. I would agree. But what it is certainly, and I would hope the court would consider, it's certainly evidence of the simple fact that what happens is here, she's the only person who comments it and uses documentation to do so, where what happens to the Peering Medical Society, they only say, well, this was what we did then. They talk about documents that they received or they sent to St. Clair Hospital and received back, but, you know, none is produced. What happens is, is very simply, the question is, is they want to hide behind the Medical Practice Act. I'm sorry, the wrong act. But if they want to go ahead and, you know, hide behind the act, what happens is, is very simply, if I can't get those documents, can they now use those documents against me by somebody going ahead and interpreting them? That's not the question I'm asking right now. The question I'm asking now is, that's not an affidavit. The lawyer from Wisconsin is not my affidavit. Correct. And the reliance by the expert, Nunley, is not, I don't recall that it being using the proper Wilson v. Clark standard about information typically relied on by people in that field. I hope we worded it in that fashion. If we haven't, then it's a mistake on my part. But if it's not worded in that fashion, your Honor, it would be correct. It's something that's got to be typically relied upon in the profession. And I would hope that we have done and established that either through ban of deposition. But what it comes down to is, again, should the statements of the Peoria Medical Society saying they got something even be considered by the simple fact that there is an act out there that prevents us from getting this information, getting the documents. And that being the case, your Honor, under the circumstances, I think we've established that this case should remain alive, should be returned to the court, and allowed to proceed forward. Thank you. Thank you, Counsel.       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.